UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARVIN I. KAPLAN,

    Plaintiff,

v.                                              Case No. 8:17-cv-2701-T-36CPT

REGIONS BANK, an Alabama
Banking corporation,

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

    This matter is before me on referral for consideration of (1) *Regions' Amended Motion to Strike Kaplan's Jury Demand* (Doc. 55) and (2) *Regions' Amended Request to Take Judicial Notice on Amended Motion to Strike Jury Trial Demand* (Doc. 57). With the benefit of oral argument and for the reasons discussed below, I respectfully recommend that the Court grant Regions' amended motion to strike and grant in part Regions' amended request to take judicial notice.

I.

    In 2008, Plaintiff Marvin Kaplan began to invest with a company, Smith Advertising & Associates (SAA), that purported to coordinate advertising print work for various cities and municipalities around the country. (Doc. 1 at 2-3). Kaplan's investments with SAA consisted of short-term loans that SAA repaid to him along

with an "incentive" amount. *Id.* Over the next several years, as the size of the deals with SAA grew larger, Kaplan formed a number of limited liability companies or used existing ones to conduct these investments. *Id.* at 3.

In 2011, the nature of the deals changed, with SAA repaying Kaplan within a shorter time period and Kaplan investing substantially greater amounts than before. *Id.* at 4-5. To execute these deals, SAA would create promissory notes for the loans, write separate checks for both the loan amounts and the incentive payments, and then overnight these items to Kaplan. *Id.* at 4. The next day, Kaplan would wire the loan amounts from his investment companies to SAA and deposit the checks upon the investments' agreed "maturity" date, which was generally the following day. *Id.*

To better accommodate the sizable wire transfers involved, Kaplan's investment companies opened accounts (Entity Accounts) with Defendant Regions Bank (Regions). *Id.* at 5. In connection with each of the Entity Accounts as well as a personal account Kaplan had with Regions, Kaplan entered into Deposit Agreements with the bank that contained a broad "Arbitration and Waiver of Jury Trial" provision.[1] *Regions Bank v. Kaplan*, No. 8:12-cv-1837-T-17MAP (M.D. Fla. 2012) (*Kaplan I*), (Docs. 177, 190-1).

Before wiring monies to SAA from the Entity Accounts, Kaplan reviewed the online account balances to ensure there were sufficient funds. (Doc. 1 at 5). Over a

---

[1] Regions and Kaplan represented at oral argument that the Deposit Agreements (including the jury waiver clause) were the same for both the Entity Accounts and Kaplan's personal account.

number of months, Kaplan utilized the Entity Accounts without incident to successfully invest large sums of money with SAA. *Id.* at 5-6.

In January 2012, however, Kaplan made a series of significant wire transfers to SAA, for which SAA's checks failed to clear. *Id*. at 6-8.  Unbeknownst to Kaplan, SAA's bank had alerted Regions about potential fraud associated with SAA's account and, as a result, Regions had placed a hold on certain SAA checks that Kaplan had deposited into the Entity Accounts. *Id*. at 7.  Kaplan eventually learned that he had been the victim of a Ponzi-like scheme and that the Entity Accounts were overdrawn by millions of dollars. *Id*. at 7-12.

Regions thereafter filed suit against Kaplan, his investment companies, and others, seeking damages for these overdrafts. *Id*. at 10; *see also Kaplan I*, (Doc. 1).  Regions also disseminated information regarding Kaplan and his wife on online databases and bulletins, causing the couple to be blacklisted from the banking industry. (Doc. 1 at 10).  Kaplan and his investment companies counterclaimed against Regions for, *inter alia*, defamation and invasion of privacy and demanded a jury trial. *Kaplan I*, (Docs. 93, 175).[2]  In November 2013, Regions amended its complaint to assert tort claims against Kaplan and his companies for fraudulent concealment, civil conspiracy, conversion, and aiding and abetting. *Id.* at (Doc. 190).

In addition to amending its complaint, Regions moved to strike Kaplan's jury demand based on the jury trial waiver in the Deposit Agreements. *Id.* at (Doc. 177).

---

[2] Those counterclaims were later dismissed. *Kaplan I*, (Doc. 244).

The court ultimately found that all claims between Regions and Kaplan, "including counterclaims/crossclaims asserted by the Kaplan Parties against Regions Bank and its employees," fell within the scope of these jury trial waivers. *Id.*, (Doc. 298 at 5).

*Kaplan I* proceeded to a bench trial in 2017, after which the court entered judgment in Kaplan's favor and against Regions with respect to each of Regions' claims. (Doc. 1 at 13). In so ruling, the court found no evidence that Kaplan knew the above-described financial transactions with SAA were illegitimate. *Id.*

The instant action (*Kaplan II*) followed in November 2017, with Kaplan asserting claims against Regions for malicious prosecution and abuse of process. *Id.* at 14-17. In support of these claims, for which Kaplan also demands a jury trial (Doc. 32), Kaplan asserts that Regions falsely accused him of knowingly participating in a fraudulent scheme with SSA, and that Regions unlawfully filed suit against him at a time when it knew or should have known these accusations were false (Doc. 1 at 14-17). In August 2018, the Court dismissed Kaplan's abuse of process claim on Regions' motion. (Docs. 11, 37).

Regions now moves to strike Kaplan's jury trial demand (Doc. 55) and, in connection with that motion, requests that the Court take judicial notice of various items from *Kaplan I* (Doc. 57). Kaplan has responded in opposition to both motions (Doc. 58), to which Regions has replied (Doc. 62). After oral argument on the matter, Regions filed a supplemental reply. (Doc. 72). The Court has since partially stayed the action and terminated all pending motions, except those brought by Regions here. (Doc. 77).

II.

The Seventh Amendment to the United States Constitution preserves the right to a jury trial "[i]n suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII. "The right to trial by jury is fundamental," and the courts accordingly "indulge[] every reasonable presumption against [a] waiver" of that right. *Mega Life & Health Ins. Co. v. Pieniozek*, 585 F. 3d 1399, 1403 (11th Cir. 2009) (internal quotation marks and citation omitted). It is well established, however, that "[a] party may validly waive its Seventh Amendment right to a jury trial so long as the waiver is knowing and voluntary." *Bakrac, Inc. v. Villager Franchise Systems, Inc.*, 164 F. App'x 820, 823 (11th Cir. 2006) (citing *Brookhart v. Janis*, 384 U.S. 1, 4-5 (1966)).[3]

As is evident from Kaplan's response to Regions' motion to strike and as Kaplan made clear at oral argument, he does not dispute the validity of the jury trial waiver in the Deposit Agreements. (Doc. 58). His chief contention is instead that his claim for malicious prosecution falls outside the scope of that waiver. *Id*. at 2-4. After careful consideration of the matter, I disagree.

In accordance with Eleventh Circuit precedent, I begin my analysis with the language of the waiver clause. *Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1340 (11th Cir. 2012) ("To determine if a claim falls within the scope of a clause, we look to the language of the clause.") (citation omitted). That waiver clause, titled

---

[3] Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

**ARBITRATION AND WAIVER OF JURY TRIAL**, provides, in pertinent part "**Whether any controversy is arbitrated or settled by a court, you [Kaplan] and we [Regions] voluntarily and knowingly waive any right to a jury trial with respect to such controversy to the fullest extent allowed by law**."[4] (Doc. 56-3 at 7, 11) (emphasis in original). The waiver clause defines "controversy" as a "Claim" and expressly assigns the term "Claim" the "broadest possible meaning." *Id.* at 7. The waiver clause goes on to specify, in relevant part, that a "Claim":

> **. . . includes, but is not limited to, any controversy, claim, . . . dispute, or disagreement, arising out of, in connection with or relating to any one or more of the following: . . . (2) any account; (3) any charge or cost incurred pursuant to the [Deposit] Agreement or any agreement; (4) the collection of any amounts due under the [Deposit] Agreement, any agreement or any account; (5) any alleged contract or tort arising out of or relating in any way to the [Deposit] Agreement, any account, any agreement, any transaction, any advertisement or solicitation, or your business, interaction or relationship with us; (6) any breach of any provision of the [Deposit] Agreement; (7) any statements or representations made to you with respect to the [Deposit] Agreement, any agreement, any account, any transaction, . . . or your business, interaction or relationship with us; (8) any property loss, damage or personal injury; (9) any claim, demand or request for compensation or damages from or against us; . . . or (11) any of the foregoing arising out of, in connection with or relating to any agreement which relates to the [Deposit] Agreement, any account, any credit, any transaction or your business, interaction or relationship with us**.

---

[4] The Deposit Agreements define "you" as, *inter alia*, "any person or entity in whose name the account is maintained . . ., and/or any person or entity that uses the account or is authorized to transact business on the account, by any means whatsoever, . . . and/or any person or entity that has a beneficial interest in the account . . . ." (Doc. 56-3 at 5). The court ruled in *Kaplan I* that the Deposit Agreements applied to all of Kaplan's accounts, *Kaplan I*, (Doc. 298), and Kaplan does not assert otherwise here.

6

*Id.* at 7-8 (emphasis in original).

The scope of this jury waiver provision is expansive by any measure, and a number of its categories squarely cover Kaplan's malicious prosecution claim. Two of those categories—categories (5) and (9)—will suffice by way of example here. The malicious prosecution claim is captured by category (5) because that claim "aris[es] out of," is "in connection with," or "relat[es] to" an "alleged tort" (i.e., the tort of malicious prosecution allegedly committed by Regions) "arising out of or relating in any way to the [Deposit] Agreement, any account" (i.e., the Entity Accounts), "any transaction," or Kaplan's "business, interaction or relationship with" Regions. (Doc. 56-3 at 7). The malicious prosecution claim is also covered by category (9) because it is made "in connection with or relating to" a "claim" or "demand" for "compensation or damages from or against" Regions. *Id.* at 8.

The conclusion that the waiver clause fully encompasses Kaplan's malicious prosecution claim not only comports with the clause's plain language, but it also accords with the case law interpreting similarly expansive jury waivers. *See, e.g., Jaffe v. Bank of America, N.A.*, 395 F. App'x 583, 586-87 (11th Cir. 2010) (extending unequivocal and broad jury waiver provisions appearing in agreements executed ancillary to parties' letter of credit agreement to tort claims brought against party for misstatements and omissions in connection with issuance of letter of credit); *Vision Bank v. Algernon Land Co., LLC*, 2010 WL 3803277, at *2-3 (S.D. Ala. Sept. 23, 2010) (comparing clause waiving claims related to parties' agreement with far broader clause

7

waiving claims related to parties' agreement, their business relationship or matters incidental thereto, the subject of the agreement, or any other controversy arising between them).

Kaplan's attempts to avoid the wide breadth of this waiver clause are unavailing. Kaplan submits three arguments in this regard: (1) courts in this District do not apply jury waivers to malicious prosecution claims (Doc. 58 at 3-4); (2) the waiver does not apply because Kaplan's malicious prosecution claim stems solely from Regions' "bad actions" in *Kaplan I*, and those actions were not "in any way dependent on the [D]eposit [A]greement[s]" themselves, *id*. at 2-4; and (3) the waiver also does not apply because the conduct of which Kaplan complains occurred after he closed his Regions accounts.[5]

Kaplan's first contention can be readily disposed of. The only decision Kaplan cites in support of this argument is *Bank of America, N.A. v. Zaskey*, 2016 WL 4264050 (S.D. Fla. Aug. 12, 2016), *vacated on reconsideration by* 2016 WL 8787295 (S.D. Fla. Sept. 19, 2016). As Regions notes, however, *Zaskey* does not stand for the broad proposition that jury trial waivers do not apply to malicious prosecution claims. (Doc. 62 at 4). In *Zaskey*, there were two agreements between the parties, one that contained a jury trial waiver provision and one that did not. 2016 WL 8787295, at *1. The *Zaskey* court initially denied a motion to enforce the jury waiver clause relative to a

---

[5] Kaplan raised this third contention for the first time at oral argument. In response, Regions requested and received leave to address this contention in writing. (Docs. 70-72). Kaplan did not make a similar request.

number of claims, including one for malicious prosecution, because it was not sure from which agreement the claims stemmed. *Id.*; *see also* 2016 WL 4264050, at *2. After determining that the claims arose under the agreement containing the jury waiver, the *Zaskey* court vacated its prior order and found that the plaintiff had waived his right to a jury trial on all remaining claims. 2016 WL 8787295, at 1-2.

Kaplan's second argument likewise fails. The crux of this contention is that, unlike in *Kaplan I*, where "the parties' tort claims were directly related to the overdrafts and alleged breaches of the [D]eposit [A]greement[s]," Regions' tortious conduct at issue here is too "remote" and insufficiently related to those agreements and the Entity Accounts to be governed by the jury waiver. (Doc. 58 at 3). In support of this assertion, Kaplan cites *Byers*, *supra*. *Id*. at 2-4.

In *Byers*, the defendant entered into a real estate purchase contract with a third party, Ginn-LA West End Limited. 701 F.3d at 1338. That contract contained a forum-selection clause requiring that all disputes related to the contract be litigated in the Bahamas. *Id*. To finance that purchase, the defendant obtained a mortgage from the plaintiff, and the mortgage note contained a different forum-selection clause mandating that disputes be litigated in Florida. *Id.* The plaintiff eventually sued the defendant in Florida for failing to make payments on the note, and the defendant lodged a counterclaim alleging that the plaintiff and others had engaged in appraisal fraud in order to inflate the amount of the mortgage note. *Id.* at 1338-39. Seeking dismissal of the counterclaim, the plaintiff argued that venue for that counterclaim

would be proper in the Bahamas under the purchase contract's forum-selection clause. *Id.* at 1339.

The Eleventh Circuit disagreed. It looked to the language of the purchase contract's forum-selection clause, which stated that disputes "related in any way" to the contract had to be litigated in the Bahamas. *Id.* at 1340. Reasoning that a claim "relates" to a contract when "the dispute occurs as a fairly direct result of the performance of contractual duties," the court found that the defendant's counterclaim alleging appraisal fraud in connection with the mortgage note was not directly related to the purchase contract. *Id.* at 1340-41 (quoting *Telecom Italia, Spa v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001)). The court also noted that the plaintiff was not a party to the purchase contract and that the contract was not the source of the parties' relationship. *Id.* at 1341.

*Byers* is materially distinguishable from the facts present here. Unlike *Byers*, the dispute in this case centers around a single jury waiver provision found in the Deposit Agreements, which both parties signed, and which are the only source of their relationship. This is therefore not a situation, as in *Byers*, where a party is seeking to enforce a contractual provision against another party, even though the first party is not a signatory to that contract.

The court's decision in *Newton v. Wells Fargo Bank*, 2013 WL 5854520 (M.D. Fla. Oct. 30, 2013) is instructive in this regard. In that case, the plaintiff alleged that the defendant, a bank, had violated the Telephone Consumer Protection Act (TCPA) by using "illegal efforts" to collect a debt owed under a mortgage agreement the

plaintiff and his wife had executed with the bank. *Id*. at *1. The bank moved to strike the plaintiff's demand for a jury trial based on a jury waiver clause contained in the parties' mortgage agreement. *Id*. In rejecting the plaintiff's argument that his TCPA claims fell outside the scope of this waiver provision, the court distinguished the facts before it from those in *Byers*. *Id*. at *2. It found that, unlike *Byers*, the mortgage was "the sole source of the parties' relationship" and that "the reason [the defendant] was planning the alleged illegal telephone calls was to collect a debt" secured by the mortgage. *Id*. The court was consequently satisfied that the plaintiff's TPCA claims were "a fairly direct result of the performance [or . . . nonperformance] of contractual duties." *Id*.

Akin to *Newton* and as noted above, the Deposit Agreements in this case are the sole source of the parties' relationship, and the tortious conduct of which Kaplan complains (i.e., malicious prosecution) took place as part of Regions' effort to collect amounts due under those agreements, at least with respect to the Entity Accounts. As such, similar to *Newton*, Kaplan's malicious prosecution claim occurred as "a fairly direct result of the performance [or . . . nonperformance] of contractual duties." *Id*.; *see also Thompson v. Caliber Home Loans, Inc.*, 2016 WL 278731 (S.D. Fla. Jan. 1, 2016) (enforcing jury waiver contained in mortgage with respect to plaintiff's consumer protection claims because plaintiff's "only relationship to [defendant] is through the [m]ortgage, and the dispute that gave rise to her claims has its genesis in [defendant's] attempts . . . to collect a debt from her as a result of her nonperformance of contractual duties established by the [m]ortgage.").

In addition to the above distinctions, the language in the waiver clause here is far broader than the waiver clause at issue in *Byers*. Unlike *Byers*, the jury waiver provision in the Deposit Agreements does not, as Kaplan suggests, apply solely to disputes "related in any way" to the Deposit Agreements themselves. Rather, as explained above, it also extends to any claim arising out of or in connection with, among other things, any claim or demand for compensation or damages made by Kaplan against Regions, or any alleged torts committed by Regions that arise out of or are related in any way to Kaplan's Entity Accounts or his relationship with the bank.

Kaplan's final argument, that the Deposit Agreements' jury waiver clause does not survive the closure of his investment accounts with Regions, also lacks merit. As Regions points out, the Deposit Agreements contain a paragraph entitled "Construction of Agreement" that provides, in relevant part: "No termination of any account will affect your liability or obligations under this Agreement accruing prior to the date of termination or any provisions of this Agreement which, by their terms or nature, are intended to survive account termination" (Docs. 56-3 at 31, 72). The plain language of this survival clause is fatal to Kaplan's argument, and he has not meaningfully argued otherwise.[6]

---

[6] In light of the limited nature of Kaplan's challenge to the jury waiver clause, I do not address the collateral estoppel argument propounded by Regions in its motion to strike. As Regions alluded to in its reply brief (Doc. 62 at 4) and as it confirmed at the hearing, it originally made this argument anticipating Kaplan would challenge the court's determination in *Kaplan I* that he was bound by the jury waiver. Because Kaplan has not raised such a challenge here, it is

III.

By way of its remaining motion, Regions requests that the Court take judicial notice of a number of items from *Kaplan I*, including various pleadings, orders, trial transcripts, and the Deposit Agreement. (Doc. 57). Kaplan opposes this request, arguing that these documents are irrelevant. (Doc. 58 at 5).

Rule 201 of the Federal Rules of Evidence permits a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Rule 201 further provides that the Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

In light of the fact that Kaplan is not challenging the validity of the jury waiver, the only item listed in Regions' request that is relevant to its motion to strike at this point is the Deposit Agreement. The existence and accuracy of that agreement is not reasonably in dispute. And, while it is not clear that the Court is required to take judicial notice of the agreement in order to rely upon it in deciding Regions' motion, I recommend that the Court do so out of an abundance of caution.

---

unnecessary for the Court to resolve the merits of Regions' collateral estoppel argument—a point that Regions essentially conceded at oral argument.

IV.

For the foregoing reasons, I recommend the Court:

1) grant *Regions' Amended Motion to Strike Kaplan's Jury Demand* (Doc. 55); and

2) grant in part Regions' *Amended Request to Take Judicial Notice on Amended Motion to Strike Jury Trial Demand* (Doc. 57) insofar as it relates to the Deposit Agreements.

Respectfully submitted this 7th day of August.

*/s/ Christopher P. Tuite*
HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

**NOTICE TO PARTIES**

A party has fourteen (14) days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding(s) or legal conclusion(s) the District Judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).

Copies furnished to:
Honorable Charlene Edwards Honeywell, United States District Judge
Counsel of record