UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARVIN I. KAPLAN,

      Plaintiff,

v.                                      Case No: 8:17-cv-2701-T-36CPT

REGIONS BANK, an Alabama
banking corporation,

      Defendant.

_____/

# O R D E R

This cause comes before the Court upon the Report & Recommendation filed by Magistrate Judge Christopher P. Tuite on August 7, 2019 (the "R&R"). Doc. 104. In the R&R, Magistrate Judge Tuite recommends that Regions Bank's ("Regions") Amended Motion to Strike Kaplan's Jury Demand (the "Motion") be granted and Regions' Amended Request to Take Judicial Notice on Amended Motion to Strike Jury Trial Demand (the "Amended Request to Take Judicial Notice") be granted-in-part. *Id.* at 14.

All parties were furnished copies of the R&R and were afforded the opportunity to file objections pursuant to 28 U.S.C. § 636(b)(1). Marvin I. Kaplan ("Kaplan") timely objected to the R&R (the "Objection"). Doc. 107. Upon consideration of the R&R, the Objection, Regions' response thereto, and this Court's independent examination of the file, it is determined that the R&R should be adopted and Kaplan's Objection should be overruled.

## I.    Background

### A.  Introduction

This action arises from an earlier case in the Middle District of Florida, styled *Regions Bank v. Kaplan, et al.*, No. 8:12-cv-1837-T-17MAP (M.D. Fla.) ("*Kaplan I*"), in which Regions

sued Kaplan and several of his investment entities for, *inter alia*, fraudulent concealment, civil conspiracy, conversion, and aiding and abetting. Doc. 113 ¶¶1, 48, 57. Kaplan began investing with Smith Advertising & Associates ("SAA") in 2008, which involved providing short-term loans to SAA that supplied "bridge financing" for SAA's printing contracts with cities and municipalities. *Id.* at ¶¶8–9, 13. The loans from investors like Kaplan purportedly provided SAA with additional cash flow to front the cost of printing contracts for its clients, and various printing vendors would give a discounted price to SAA in exchange for SAA's upfront payment. *Id.* at ¶9. Rather than passing the savings from the discount along to its customers, SAA would allegedly charge its customers the full price of the printing vendor's services, retain the savings, and split the discount with the investor as an "incentive." *Id.* at ¶10. Kaplan formed several limited liability companies or used existing ones to invest with SAA over the course of the next few years as the size of deals grew larger. *Id.* at ¶14.

### B. The "Bundled Deals" and the Deposit Agreement

The nature of the deals changed in 2011, however, as Todd Smith ("Smith"), one of the officers of SAA, offered a purported investment opportunity, known as the "bundled deals." *Id.* at ¶¶14, 16. Under these "bundled deals," SAA would repay Kaplan in full within a much shorter time frame, often the same day as Kaplan's initial investment, because the bundled deals allegedly corresponded to SAA's cash flow and were based on multiple contracts that were "bundled" together. *Id.* at ¶17. To execute the "bundled deals," Smith would contact Kaplan regarding certain proposed print contracts and short-term investments. *Id.* at ¶19. After Kaplan and Smith agreed to terms, Smith would create promissory notes for the investment loans with respect to each of Kaplan's investment companies, write checks for both the principal repayment and incentive payment, and overnight these items to Kaplan. *Id.* The next day, Kaplan would wire the principal

investment from his investment companies to SAA. *Id.* On the same day, Kaplan would receive the repayment checks and promissory notes from Smith and deposit the checks upon the investments' agreed "maturity" date, which was typically the following day. *Id.*

Kaplan's investment companies opened bank accounts (the "Entity Accounts") with Regions to better accommodate the large wire transfers for the "bundled deals." *Id.* at ¶23. Kaplan had previously opened a personal checking account (the "Personal Account") with Regions, as well. *Id.* at ¶7; Doc. 55 at 2. In opening the Personal Account and the Entity Accounts, Kaplan purportedly received the Deposit Agreement for each account (the "Deposit Agreement"). *See* Doc. 55 at 2–3. Kaplan does not dispute that he received the Deposit Agreement for each account. *See* Doc. 58 at 2. The Deposit Agreement contains a jury waiver provision, which is discussed in further detail below. Doc. 56-3 at 2–3, 7. Kaplan reviewed online the balances of the Entity Accounts to ensure sufficient funds existed before wiring any funds to SAA, but Regions' systems did not possess the ability to distinguish between "cleared" and "available" funds.[1] Doc. 113 ¶¶23–24. Kaplan invested in the "bundled deals," which progressively grew larger, without incident from November 2011 through January 2012. *Id.* at ¶26.

### C. *Kaplan I*

In January of 2012, Kaplan made a series of wire transfers for large sums of money to SAA. *Id.* at ¶¶28–29, 31–32, 36. Unbeknownst to Kaplan, however, Regions had placed a hold on the reimbursement checks for one of the agreements between Kaplan and SAA after SAA's bank alerted Regions to possible fraud in SAA's account. *Id.* at ¶33. SAA's reimbursement checks to Kaplan for these transfers subsequently failed to clear and were returned. *Id.* at ¶¶ 34, 36–37, 41–

---

[1] Kaplan also alleges that he had no indication that Regions extended provisional credit when it wire-transferred millions of dollars from the Entity Accounts based on SAA checks that had not cleared after they were deposited. Doc. 113 ¶24.

42, 46–47. As a result, the Entity Accounts were overdrawn by millions of dollars. *See id.* at ¶¶42, 48.

Regions thereafter filed the *Kaplan I* lawsuit against Kaplan, Kaplan's investment entities, and others, seeking damages for the overdrafts. *Id.* at ¶48. Regions filed an amended complaint in *Kaplan I* in 2013, which asserted tort claims against Kaplan and his investment companies for, *inter alia*, fraudulent concealment, civil conspiracy, conversion, and aiding and abetting. *Id.* at ¶57. The trial in *Kaplan I* commenced in June of 2016. *Id.* at ¶60. The court subsequently ruled in favor of Kaplan and against all of Regions' tort claims. *Id.* at ¶61.

### D. Present Action, Jury Trial Waiver, and Procedural History

Kaplan initiated this action in November of 2017, alleging claims against Regions for malicious prosecution and abuse of process. Doc. 1 ¶¶67–87. The Court dismissed Kaplan's abuse of process claim in August of 2018. Doc. 37 at 10. In relevant part, Kaplan alleges that Regions brought claims against Kaplan for fraudulent concealment, conversion, aiding and abetting conversion, and civil conspiracy in *Kaplan I* when it knew or should have known that such claims lacked a factual basis. Doc. 113 ¶69. Kaplan demands a jury trial for its claim. Doc. 32. Regions moves to strike this jury trial demand and also requests the Court to take judicial notice of numerous filings and documents in *Kaplan I*. Docs. 55, 57.

In support of its argument that Kaplan's jury trial demand should be struck, Regions points to the jury waiver clause in the Deposit Agreement. Doc. 55 at 15–18. As previously mentioned, Kaplan received the Deposit Agreement when he opened the Personal Account and Entity Accounts. *See id.* at 2–3; Doc. 58 at 2. The Deposit Agreement contains the following language on its second page:

> **ARBITRATION AND WAIVER OF JURY TRIAL. THIS AGREEMENT CONTAINS PROVISIONS FOR BINDING ARBITRATION AND WAIVER OF JURY TRIAL. YOUR ACCEPTANCE OF THIS AGREEMENT INCLUDES YOUR ACCEPTANCE OF AN AGREEMENT TO SUCH PROVISIONS. WHEN ARBITRATION IS INVOKED FOR CLAIMS SUBJECT TO ARBITRATION, YOU AND REGIONS WILL NOT HAVE THE RIGHT TO PURSUE THAT CLAIM IN COURT OR HAVE A JURY DECIDE THE CLAIM AND YOU WILL NOT HAVE THE RIGHT TO BRING OR PARTICIPATE IN ANY CLASS ACTION OR SIMILAR PROCEEDING IN COURT OR IN ARBITRATION.**

Doc. 56-3 at 2. The Deposit Agreement's jury waiver clause is located within a section of the Deposit Agreement entitled "**ARBITRATION AND WAIVER OF JURY TRIAL.**" *Id.* at 3. In relevant part, that section provides, "**Whether any controversy is arbitrated or settled by a court, you and we voluntarily and knowingly waive any right to a jury trial with respect to such controversy to the fullest extent allowed by law.**"[2] *Id.* at 7 (emphasis in original). The Deposit Agreement defines "any controversy . . . between [Kaplan] and [Regions]" as a "Claim," which the Deposit Agreement affords a broad meaning. *Id.* at 3. Specifically, the Deposit Agreement provides:

---

[2] The Deposit Agreement defines "you" as:

> "[A]s the context may require, any person or entity in whose name the account is maintained according to our records, and/or any person or entity that uses the account or is authorized to use transact business on the account, by any means whatsoever, . . . and/or any person or entity that has a beneficial interest in the account.

(Doc. 56-3 at 1). Similarly, the Deposit Agreement defines "we" and "us" as:

> Regions Bank, and with respect to any **BINDING ARBITRATION AND/OR WAIVER OF JURY TRIAL** provisions set forth in this Agreement, such terms also mean and refer to Regions Bank and its current and former parent(s), subsidiaries, affiliates, employees, officers, directors, agents, controlling persons and representatives, as well as any other person or company who provides any services in connection with an account, as may exist from time to time.

*Id.* at 2 (emphasis in original).

> Claim has the broadest possible meaning and includes, but is not
> limited to, any controversy, claim, counterclaim, dispute or
> disagreement arising out of, in connection with or relating to
> any one or more of the following: (1) the interpretation,
> execution, administration, amendment or modification of the
> Agreement or any agreement; (2) any account; (3) any charge
> or cost incurred pursuant to the Agreement or any agreement;
> (4) the collection of any amounts due under the Agreement, any
> agreement or any account; (5) any alleged contract or tort
> arising out of or relating in any way to the Agreement, any
> account, any agreement, any transaction, any advertisement or
> solicitation, or your business interaction or relationship with us;
> (6) any breach of any provision of the Agreement; (7) any
> statements or representations made to you with respect to the
> Agreement, any agreement, any account, any transaction, any
> advertisement or solicitation, or your business, interaction or
> relationship with us; (8) any property loss, damage or personal
> injury; (9) any claim, demand or request for compensation or
> damages from or against us; (10) any damages incurred on or
> about our premises or property; or (11) any of the foregoing
> arising out of, in connection with or relating to any agreement
> which relates to the Agreement, any account, any credit, any
> transaction or your business, interaction or relationship with us.

*Id.* at 3–4 (emphasis in original). The Deposit Agreement also states that the "waiver of jury trial shall survive your death, the closing of your account and the termination of any of your business or transaction(s) with us, any bankruptcy to the extent consistent with applicable bankruptcy law and shall also survive as to any Claim covered within the scope of this [Deposit] Agreement." *Id.* at 6–7.

Upon consideration of the Motion, the Amended Request to Take Judicial Notice, the response in opposition to the Motion, the reply, the supplemental reply, and the parties' oral arguments, Magistrate Judge Tuite issued the R&R. (Doc. 104). Magistrate Judge Tuite recommends that the Court: (1) grant the Motion; and (2) grant-in-part the Amended Request to Take Judicial Notice insofar as it relates to the Deposit Agreement. *Id.* at 14.

Following the entry of Magistrate Judge Tuite's R&R, this Court ordered Kaplan to show cause as to why this action should not be dismissed for lack of subject matter jurisdiction as a

result of Kaplan's failure to properly plead diversity of citizenship. Doc. 111 at 4. Kaplan subsequently filed a response and an amended complaint. Docs. 112, 113. Aside from omitting the abuse of process claim and adding allegations to clarify the citizenship of the parties, the amended complaint is identical to the original complaint.[3] *See* Doc. 112 at 2; Doc. 113 ¶¶2–3.

## II. Legal Standard

When a party makes a timely and specific objection to a magistrate judge's report and recommendation, the district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). With regard to those portions of the report and recommendation not objected to, the district judge applies a clearly erroneous standard of review. *See Gropp v. United Airlines, Inc.*, 817 F. Supp. 1558, 1562 (M.D. Fla. 1993). The district judge may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1)(C). The district just may also receive additional evidence or recommit the matter to the magistrate judge with instructions. *Id*; Local R. M.D. Fla. 6.02(a). "The district court retains the discretion to consider new evidence and argument raised for the first time in an objection to a report and recommendation." *Cooper v. Dolgencorp, LLC*, No. 5:11-cv-158-Oc-10GJK, 2011 WL 13323145, at *1 n.2 (M.D. Fla. June 24, 2011) (citing *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009)).

---

[3] Kaplan's filing of the amended complaint did not withdraw or otherwise invalidate his jury demand. An amended complaint generally supersedes an original complaint, but a jury demand is not an element of a complaint, even though it may be included in a pleading. *Thomas v. Home Depot USA, Inc.*, 661 F. App'x 575, 577–578 (11th Cir. 2016). Here, Kaplan timely filed a demand separately from his initial complaint. Doc. 32. The Federal Rules of Civil Procedure govern the manner in which a jury demand may be properly withdrawn. *See* Fed. R. Civ. P. 38. "Nothing in the Federal Rules of Civil Procedure provides that a proper and complete jury demand can be withdrawn by a later amended complaint totally silent on the issue of a jury trial." *Thomas*, 661 F. App'x at 578.

### III.   Analysis

Kaplan raises two main objections to the R&R: (1) Magistrate Judge Tuite erred in concluding that the malicious prosecution claim falls within the scope of the jury waiver; and (2) Magistrate Judge Tuite erred in concluding that the Deposit Agreement permits the jury waiver to survive termination and cover claims arising thereafter. Doc. 107 at 4–12. The Court will address each objection.

### A.  Judge Tuite Correctly Decided that the Malicious Prosecution Claim Falls Within the Scope of the Jury Waiver

Kaplan argues that Magistrate Judge Tuite erred in concluding that the malicious prosecution claim in this action falls within the scope of the jury waiver of the Deposit Agreement. Upon review, the Court agrees with Magistrate Judge Tuite's conclusion.

The Seventh Amendment to the United States Constitution preserves the right to a trial by jury "[i]n suits at common law, where the value in controversy shall exceed twenty dollars." U.S. Const. amend. VII. Rule 38, Federal Rules of Civil Procedure, "preserve[s] to the parties inviolate" the right of trial by jury under the Seventh Amendment.[4] Fed. R. Civ. P. 38. Jury trial waivers must be analyzed with "'exacting scrutiny,' indulging all reasonable presumptions against a finding of waiver." *Strickland v. Wyndham Vacation Resorts, Inc.*, No. 6:13-cv-1000-Orl-23GJK, 2014 WL 12873407, at *3 (M.D. Fla. June 10, 2014) (quoting *Mega Life & Health Ins. Co. v. Pieniozek*, 585 F.3d 1399, 1403 (11th Cir. 2009)). "[B]ecause the right to a jury trial is fundamental, 'courts must indulge every reasonable presumption against waiver.'" *Burns v. Lawther*, 53 F.3d 1237, 1240 (11th Cir. 1995) (per curiam) (citing *LaMarca v. Turner*, 995 F.2d 1526, 1544 (11th Cir. 1993)).

---

[4] A party may demand a jury trial on an issue triable of right by a jury by: "(1) serving the other parties with a written demand—which may be included in a pleading—no later than 14 days after the last pleading directed to the issue is served; and (2) filing the demand in accordance with Rule 5(d). Fed. R. Civ. P. 38(b). Unless a party properly serves and files its jury trial demand, that party waives a jury trial. Fed. R. Civ. P. 38(d).

"[A] court's discretion is very narrowly limited and must, wherever possible, be exercised to preserve jury trial." *Borgh v. Gentry*, 953 F.2d 1309, 1311 (11th Cir. 1992) (internal quotations omitted). Nonetheless, against this backdrop, "[a] party may validly waive its Seventh Amendment right to a jury trial so long as the waiver is knowingly and voluntary." *Bakrac, Inc. v. Villager Franchise Sys., Inc.*, 164 F. App'x 820, 823 (11th Cir. 2006) (citing *Brookhart v. Janis*, 384 U.S. 1, 4–5 (1966)).

"It is well settled that the right to a jury trial in federal courts is determined by federal law in diversity actions." *Allyn v. W. Life Assurance Co.*, 347 F. Supp. 2d 1246, 1251 (M.D. Fla. 2004) (citing *Simler v. Conner*, 342 U.S. 221, 222 (1963)). This includes the enforceability of a jury waiver clause. *See id.* In examining the enforceability of a jury waiver clause, courts generally analyze whether a party knowingly and voluntarily waived its right to a jury trial by examining several factors. *Strickland*, 2014 WL 12873407, at *3. Here, as Magistrate Judge Tuite pointed out, Kaplan does not dispute the validity of the jury trial waiver, only the extent of its scope. Doc. 104 at 5 ("As is evident from Kaplan's response to Regions' motion to strike and as Kaplan made clear at oral argument, he does not dispute the validity of the jury trial waiver . . . His chief contention is instead that his claim for malicious prosecution falls outside the scope of that waiver.").

In determining whether a particular claim falls within a clause's scope, courts within the Eleventh Circuit examine the language of the clause. *Bah. Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1340 (11th Cir. 2012). In interpreting whether a claim falls within the scope of a clause, the Eleventh Circuit Court of Appeals has emphasized that, "[u]nder general contract principles, the plain meaning of a contract's language governs its interpretation." *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011) "The court must look at the contract as a whole,

the parties, and the purpose of the agreement to best determine the intent of the parties in interpreting the agreement." *Id.* at 1330. "A claim 'relates to' a contract when the dispute occurs as a fairly direct result of the performance of contractual duties." *Byers*, 701 F.3d at 1340–41 (quoting *Slater*, 634 F.3d at 1330–31). Although the Eleventh Circuit set forth this rule outside the context of jury trial waivers, several courts in this Circuit have applied it when a party challenges whether a claim falls within the scope of a jury trial waiver clause. *See, e.g.*, *Newton v. Wells Fargo Bank N.A.*, No. 3:13-cv-1017-J-32MCR, 2013 WL 5854520, at *1 (M.D. Fla. Oct. 30, 2013); *Napa Overseas, S.A. v. Nextran Corp.*, No. 16-20862-CIV-MORENO, 2016 WL 6601451, at *2 (S.D. Fla. Nov. 7, 2016); *Thompson v. Caliber Home Loans, Inc.*, No. 15-21616-CIV-GAYLES, 2016 WL 278731, at *3 (S.D. Fla. Jan. 22, 2016). The Eleventh Circuit has also explained:

> The fact that a dispute could not have arisen but for an agreement does not mean that the dispute necessarily "relates to" that agreement. The phrase "related to" marks a boundary by indicating some direct relationship. Requiring a direct relationship between the claim and the contract is necessary because, if "relate to" were taken to extend to the furthest stretch of its indeterminacy, it would have no limiting purpose because really, universally, relations stop nowhere.

*Byers*, 701. F3d at 1341 (internal citations and alterations omitted).

In seeking to strike Kaplan's jury demand, Regions argues that the present action is within the scope of the jury waiver.[5] Doc. 55 at 15. In his response in opposition, Kaplan argues that, although the Deposit Agreement gave rise to Regions' claims in *Kaplan I* to the extent that "the

---

[5] Throughout much of the Motion, Regions argues that the doctrine of collateral estoppel precludes Kaplan from relitigating facts and issues decided in *Kaplan I* and the jury trial waiver is enforceable. (Doc. 55 at 6–15). Magistrate Judge Tuite did not address the collateral estoppel argument in the R&R because Regions represented at the hearing on the Motion that it initially made this argument in anticipation of Kaplan challenging Judge Kovachevich's determination in *Kaplan I* that he was bound by the jury waiver. (Doc. 104 at 12 n.6). Magistrate Judge Tuite reasoned that resolving the merits of the collateral estoppel argument was thus unnecessary because Kaplan failed to raise such a challenge. *Id.*

parties' tort claims were directly related to the overdrafts and companion alleged breaches of the [D]eposit [A]greement," his claim in this action is in response to Regions' own actions in *Kaplan I*. Doc. 58 at 3. Kaplan does not dispute the validity of the jury waiver. Doc. 104 at 5. Instead, Kaplan assets that his malicious prosecution claim in this action falls outside the scope of the jury waiver. Docs. 58 at 2–4;107 at 4–8. Regions attacks Kaplan's distinction and asserts that the jury waiver's language does not limit the type of disputes, claims, or controversies described therein. Doc. 62 at 3–4.

Upon his review of the Deposit Agreement, Magistrate Judge Tuite found that a number of the aforementioned categories within the jury waiver's "Claim" definition cover Kaplan's malicious prosecution claim. Doc. 104 at 7. In addition to citing case law regarding expansive jury waivers, Magistrate Judge Tuite highlighted that the Deposit Agreements for the accounts in this case are the sole source of relationship between the parties and the alleged malicious prosecution occurred as part of Regions' effort to collect amounts due under the Deposit Agreements, at least with respect to the Entity Accounts. *Id.* at 11. Magistrate Judge Tuite emphasized that the jury waiver "extends to any claim arising out of or in connection with, among other things, any claim or demand for compensation made by Kaplan against Regions, or any alleged torts committed by Regions that arise out of or are related in any way to [the Entity Accounts] or Kaplan's relationship with the bank." *Id.* at 12.

### i. The Plain Language of the Jury Waiver Clause Covers the Malicious Prosecution Claim

The Court begins, as it must, with the plain language of the jury waiver clause. As previously mentioned, the jury waiver states that the parties knowingly and voluntarily waive any right to a jury trial with respect to a "controversy" to the fullest extent allowed by law. Doc. 56-3 at 7. "[A]ny controversy . . . between [Kaplan] and [Regions]" is defined as a "Claim," which the

Deposit Agreement in turn assigns the "the broadest possible meaning," including, without limitation, "any controversy, claim, counterclaim, dispute or disagreement arising out of, in connection with or relating to any one or more of the" listed categories. *Id.* at 3. Consequently, pursuant to this language, the parties knowingly and voluntarily waived any right to a jury trial with respect to "any controversy, claim, counterclaim, dispute, or disagreement arising out of, in connection with or relating to any one or more of the" listed categories.

Magistrate Judge Tuite cited two categories—categories (5) and (9)—as examples of categories that cover Kaplan's malicious prosecution claim. Doc. 104 at 7. The Court will address these categories. First, as to the fifth category, the parties waived any right to a jury trial with respect to any controversy, claim, or dispute arising out of, in connection with, or relating to any alleged tort "arising out of or relating in any way to the [Deposit] Agreement, any account, any agreement, any transaction, any advertisement or solicitation, or [Kaplan's] business, interaction or relationship with [Regions]." Doc. 53-3 at 3. Magistrate Judge Tuite explained:

> The malicious prosecution claim is captured by category (5) because that claim "aris[es] out of," is "in connection with," or "relat[es] to" an "alleged tort" (i.e., the tort of malicious prosecution allegedly committed by Regions) "arising out of or relating in any way to the [Deposit] Agreement, any account" (i.e., the Entity Accounts), "any transaction," or Kaplan's "business, interaction or relationship with" Regions.

Doc. 104 at 7 (quoting 56-3 at 7) (alterations in original).

Another interpretation of this category is that it captures Kaplan's malicious prosecution claim in this action because the claim "aris[es] out of," is "in connection with" or "relat[es] to" the torts alleged by Regions against Kaplan in *Kaplan I* (*i.e.*, fraudulent concealment, conversion, aiding and abetting conversion, and civil conspiracy), as those alleged torts "aris[e] out of or relat[e] in any way to the [Deposit] Agreement, any account, any transaction" or "[Kaplan's] business, interaction or relationship with [Regions]." Doc. 56-3 at 3. Thus, based on the plain

language of this category, Kaplan's malicious prosecution claim falls within the scope of the waiver.

Next, as to the ninth category, the parties waived any right to a jury trial with respect to any controversy, claim, or dispute arising out of, in connection with, or relating to, "any claim, demand or request for compensation or damages from or against [Regions]." Doc. 56-3 at 4. Magistrate Judge Tuite found that this category covered Kaplan's malicious prosecution claim because the claim "is made 'in connection with or relating to' a 'claim' or 'demand' for 'compensation or damages from or against' Regions." Doc. 104 at 7. The Court agrees with this interpretation. The plain language of this category covers Kaplan's malicious prosecution claim because the claim constitutes a "controversy, claim . . .[or] dispute" that is "in connection with or relating to" a "claim, demand, or request for compensation or damages from or against" Regions, as the claim is in connection with or relating to Kaplan's demand for "compensatory and special damages, punitive damages, attorney's fees and costs," and other just relief "from or against" Regions. Doc. 113 at 16. Because the Court agrees with Magistrate Judge Tuite that the fifth and ninth categories cover Kaplan's malicious prosecution claim, an examination of the remaining categories is unwarranted.

A review of the Deposit Agreement as a whole, the parties, and the Deposit Agreement's purpose does not alter this conclusion. The present lawsuit is between Kaplan and Regions. Both parties are parties to the Deposit Agreement. Kaplan entered into the Deposit Agreement with Regions with respect to the Personal Account, and Kaplan entered into the Deposit Agreement with Regions on behalf of his investment companies with respect to the Entity Accounts. *See* Doc. 55 at 2–3. The Deposit Agreement "covers any and all deposit accounts you have or have had from time to time with Regions Bank, by whatever name or description, including, but not limited to,

checking accounts, savings accounts, money market deposit accounts, time deposit accounts, and certificates of deposit." Doc. 56-3 at 1. In setting forth the terms related to this purpose, the Deposit Agreement has an expansive, yet not limitless, reach. The malicious prosecution claim relates to *Kaplan I* and, although the parties dispute the degree, ultimately arises from the Deposit Agreement. Although this "but-for" connection certainly does not, by itself, mean the malicious prosecution claim necessarily is linked to the Deposit Agreement, the Deposit Agreement's intentionally expansive language, in conjunction with the nature of the malicious prosecution claim, does not disturb the conclusion that the jury waiver covers the claim.

Therefore, the plain language of the jury waiver encompasses Kaplan's malicious prosecution claim.

### ii. Kaplan's Additional Arguments are Unavailing

Kaplan generally argues that the Court's analysis must focus on whether the parties' relationship has its source in the Deposit Agreement and should not ignore the fundamental right to a jury trial. Doc. 107 at 4–8. The Court disagrees with Kaplan's arguments.

Kaplan does not attack the plain language of the jury waiver provisions in his Objection. Kaplan instead argues that this analysis "overlooks the fact that the right to a jury trial is a fundamental constitutional right" and "in the context of jury waivers[,] all permissible inferences are construed against waiver."[6] Doc. 107 at 4 (internal emphasis omitted). The Court is cognizant

---

[6] Kaplan seemingly reiterates these arguments in a final, succinct objection to the R&R, devoid of any supporting authority, in which he asserts that public policy and fairness cannot support upholding the jury waiver. Doc. 107 at 12–13. Whether a jury waiver is unconscionable, contrary to public policy, or unfair is typically analyzed in the context of whether a party knowingly and voluntarily agreed to its terms. *See, e.g.*, *Allyn*, 347 F. Supp. 2d at 1252; *Hooper v. Ideal Image Dev. Corp.*, No. 8:14-cv-2778-T-30EAJ, 2015 WL 1508494, at *2 (M.D. Fla. Apr. 1, 2015). Kaplan does not dispute the validity of the jury waiver. Doc 104 at 5. Kaplan does not argue that he did not knowingly and voluntarily agree to its terms. Thus, in light of his stipulation to the validity of the jury waiver and the analysis herein, this argument is unavailing.

of these principles. However, "[i]n the contractual waiver context, overcoming the presumption [against waiver] requires that the waiver be knowing and voluntary." *Penn Nat'l Mut. Ins. Co. v. IPSCO Steel (Ala.), Inc.*, No. 07-0524-WS-M, 2009 WL 10695238, at *2 (S.D. Ala. Jan. 8, 2009). Here, there is no dispute regarding the waiver's validity, only its scope. Doc. 104 at 5. Furthermore, recognizing the fundamental constitutional right of a jury trial and the indulgence of all reasonable presumptions against waiver does not provide Kaplan with a basis to subvert the plain language of the waiver, the validity of which, again, Kaplan does not dispute. *Id.* While the Court must indulge all reasonable presumptions against waiver in interpreting the language of the waiver clause, its obedience to this cannon of interpretation should not result in the Court overriding or re-writing the clear and unambiguous language of the clause. "However strong the presumption against waiver may be, it cannot be applied in a manner that trumps the plain meaning of a contractual waiver." *Fifth Third Bank by R-G Crown Bank, FSB v. Qureshi*, No. 6:09-cv-1519-Orl-18DAB, 2010 WL 11623678, at *4 (M.D. Fla. Feb. 24, 2010).

Next, in the R&R, Magistrate Judge Tuite rejected Kaplan's assertion that the jury waiver does not apply to the malicious prosecution claim because the claim stems from Regions' "'bad actions' in *Kaplan I*, and those actions were not 'in anyway dependent on the Deposit Agreements' themselves." Doc. 104 at 8–9 (quoting Doc. 58 at 2–4) (internal alterations omitted). The Objection reiterates that the malicious prosecution claim falls outside the scope of the Deposit Agreement, in which Kaplan argues that the analysis "must extend beyond whether or not there is a relationship between the parties, but whether that relationship has its source in the *agreement* containing the waiver." Doc. 107 at 5 (emphasis added). Kaplan argues that "the relationship contemplated by the Deposit Agreements is that of bank/banking customer" and that "[t]he claims and controversies

described by the waiver clause must be viewed in light of that relationship" between the parties.[7] *Id.* at 8.

This argument is problematic in light of the waiver's plain language. As continuously emphasized herein, the jury waiver is undoubtedly broad by its plain language, as it assigns the "broadest possible meaning" to Claim, which, in turn, includes, without limitation, eleven categories, some of which are quite expansive. Doc. 56-3 at 3, 7. Indeed, Magistrate Judge Tuite recognized that the jury waiver's scope was "expansive by any measure." Doc. 104 at 7. The relevant categories in the Deposit Agreement's jury waiver do not limit the jury waiver to only those controversies, claims, disputes, or disagreements arising out of, in connection with, or relating to the Deposit Agreement. Pursuant to the fifth category, the parties waived any right to a jury trial with respect to "any controversy, claim, counterclaim, dispute or disagreement arising

---

[7] Kaplan relies heavily on *Smith v. Lucent Technologies, Inc.*, No. Civ.A. 02-0481, 2004 WL 515769, at *1 (E.D. La. Mar. 16, 2004). This case is not binding upon this Court and, upon review, its facts are distinguishable. In *Smith*, Actel Integrated Communications, Inc. ("Actel") signed an agreement with Lucent Technologies, Inc. ("Lucent"), whereby Lucent agreed to provide communications software and support. *Id.* at *1–2. Actel entered into a subsequent lending agreement with Lucent's subsidiary for working capital and expenses to finance the purchase. *Id.* at *2. Lucent's technology did not function properly, however, which resulted in Lucent and Actel entering into a loan and security agreement (the "2000 Agreement") to advance certain funds to Actel. *Id.* The 2000 Agreement contained a jury waiver clause, which stated that "Borrower" and "Lender" agreed to waive the right to trial by jury in an action or proceeding arising out of or relating to the 2000 Agreement or any conduct, acts, or omissions of "Lender" or "Borrower" or their agents in "all foregoing cases," whether sounding in tort or contract or otherwise. *Id.* at *19. Lucent moved to strike the jury demand in a subsequent lawsuit by Actel's bankruptcy trustee based on this language. *Id.* at *18. The court explained that the trustee's claims were unrelated to the lender-borrower relationship established by the 2000 Agreement. *Id.* at *19. The court accordingly found that presuming that the jury waiver provision extended to contract or tort claims that did not relate in any way to "any loan or financing or any aspect of the lender/borrower relationship" was unreasonable. *Id.* at *20. Unlike *Smith*, in which the 2000 Agreement referred to the parties as "Borrower" and "Lender," the jury waiver in the Deposit Agreement does not use such limiting terms to define Kaplan and Regions. On the contrary, the terms used to refer to the parties are quite broad. Applying the same analysis as *Smith*, as Kaplan encourages the Court to do, would subvert the plain language of the Deposit Agreement and waiver clause.

out of, in connection with or relating to . . . any alleged contract or tort arising out of or relating in any way to the *[Deposit] Agreement, any account, any agreement, any transaction, any advertisement or solicitation, or your business, interaction, or relationship with us . . . .*" Doc. 56-3 at 3, 7 (emphasis added). Similarly, pursuant to the ninth category, the parties waived any right to a jury trial with respect to "any controversy, claim, counterclaim, dispute or disagreement arising out of, in connection with or relating to . . . any claim, demand or request for compensation or damages from or against us." *Id.* at 3–4, 7.

For the same reason, the line of cases that apply *Byers* to determine whether a contract's jury waiver provisions cover a subsequent claim brought by one of the parties to the contract is unavailing. As mentioned above, the Eleventh Circuit has recognized that "[a] claim 'relates to' a contract when the dispute occurs as a fairly direct result of the performance of contractual duties." *Byers*, 701 F.3d at 1340–41 (quoting *Slater*, 634 F.3d at 1330–31). Courts within this Circuit have applied this rule to determine whether a contract's jury waiver provision covers a subsequent claim brought by one of the parties to the contract. *See, e.g.*, *Newton*, 2013 WL 5854520, at *1; *Napa Overseas*, 2016 WL 6601451, at *2; *Thompson*, 2016 WL 278731, at *3. However, because the rule applies when interpreting whether a claim relates to a contract, the jury waiver clauses in each of these cases waived a jury trial in actions, proceedings, or claims arising out of or relating in any way to the contract itself. As a result, these cases are distinguishable from the instant action.

For example, the mortgage's jury waiver clause in *Newton* provided: "The Borrower hereby waives any right to trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or in tort, at law or in equity, arising out of or in any way related to *this Security Instrument or Note*." 2013 WL 5854520, at *1 (emphasis added). Given the waiver's language, the court's analysis focused on whether the plaintiff's subsequent TCPA claims arose out of or

were related to the mortgage, and the court reiterated that *Byers* required the court to examine whether the "dispute occur[ed] as a fairly direct result of the performance of contractual duties" in interpreting whether the claim related to the mortgage. *Id.* (internal quotations omitted). Similarly, the plaintiff in *Thompson* executed a note and mortgage, which the court referred to collectively as the "Mortgage," with Wilmington Finance, Inc. 2016 WL 278731, at *1. The jury waiver provision therein was identical to the jury waiver in *Newton. Id.* The plaintiff thereafter filed a lawsuit against the subsequent holder of the Mortgage and the loan servicer for the Mortgage, alleging that the two entities engaged in illegal debt collection practices after she became delinquent on the debt. *Id.* After resolving the defendants' standing to challenge the applicability of the waiver clause to the plaintiff's claims, the court addressed the scope of the waiver, which, based on the waiver's language, involved examining whether the plaintiff's claims related to the Mortgage.[8] *Id.* at *2–4. A review of similar cases reveals that the jury waivers in those cases were also tailored to the particular agreement in which the waiver was located. *See*, *e.g.*, *Levinson v. Green Tree Servicing, LLC*, No. 8:14-cv-2120-EAK-TGW, 2015 WL 1912276, at *1 (M.D. Fla. Apr. 27, 2015); *Bank of Am., N.A. v. Zasky*, No. 9:15-cv-81325-ROSENBERG/HOPKINS, 2016 WL 8787295, at *1 (S.D. Fla. Sept. 19, 2016).

In contrast to this line of cases, the relevant categories in the Deposit Agreement's jury waiver do not limit the jury waiver to only those controversies, claims, disputes, or disagreements

---

[8] By way of another example, the agreement between the parties in *Napa Overseas* stated, in relevant part: "The parties hereby irrevocably and unconditionally waive any right they may have to a trial by jury in any suit, action, proceeding, or counterclaim arising out of or relating to this sales agreement." 2016 WL 6601451 at *2. After the plaintiff executed the agreement with the defendant and subsequently filed a lawsuit against the defendant, the defendant moved to strike the plaintiff's jury demand. *Id.* at *1. Because the agreement stated that the parties waived any jury trial right in "any suit action, proceeding, or counterclaim arising out of or relating to" the agreement, the court was tasked with "determin[ing] whether any of [the plaintiff's] contested claims 'ar[o]se out of or relat[ed]' to the" agreement. *Id.* at *2.

arising out of, in connection with, or relating to the Deposit Agreement. Pursuant to the fifth category, the parties waived any right to a jury trial with respect to "any controversy, claim, counterclaim, dispute or disagreement arising out of, in connection with or relating to . . . any alleged contract or tort arising out of or relating in any way to the *[Deposit] Agreement, any account, any agreement, any transaction, any advertisement or solicitation, or your business, interaction, or relationship with us* . . . ." Doc. 56-3 at 3, 7 (emphasis added). Similarly, pursuant to the ninth category, the parties waived any right to a jury trial with respect to "any controversy, claim, counterclaim, dispute or disagreement arising out of, in connection with or relating to . . . any claim, demand or request for compensation or damages from or against us." *Id.* at 3–4, 7. The plain language of the applicable categories of the jury waiver here is more expansive than the language in the foregoing cases. Unlike the foregoing cases, the claims covered by these two categories are not anchored to only the Deposit Agreement. Consequently, any analysis of whether the claim "relates to" the Deposit Agreement is unavailing, as the applicable categories, while not limitless, nonetheless cover claims beyond those that simply "relate[] to" the Deposit Agreement.

Regardless, relying on *Byers* and its prodigy to interpret "relates to" as "a fairly directly result" compels the same conclusion. For example, applying this interpretation when examining the fifth category of the jury waiver, Kaplan waived any right to a jury trial with respect to "any controversy, claim, counterclaim, dispute or disagreement" occurring as a fairly direct result of "any alleged contract or tort" occurring as a fairly directly result "in any way to the [Deposit] Agreement, any account, any agreement, any transaction, any advertisement or solicitation, or [Kaplan's] business, interaction or relationship with [Regions]." Doc. 56-3 at 3, 7. This interpretation of the fifth category of the jury waiver clause would capture Kaplan's malicious prosecution claim because the claim occurred as a fairly direct result of the torts alleged by Regions

against Kaplan in *Kaplan I*, which occurred as a fairly direct result in any way to the Deposit Agreement.

Accordingly, for all of the foregoing reasons, Magistrate Judge Tuite correctly found that Kaplan's malicious prosecution claim falls within the scope of the jury waiver provision.

### B. Magistrate Judge Tuite Correctly Held that the Jury Waiver Survives the Closure of the Accounts

Magistrate Judge Tuite rejected Kaplan's argument that the jury waiver clause does not survive the closure of the accounts with Regions. Doc. 104 at 12. Upon review, the Court agrees with Magistrate Judge Tuite that the jury waiver survives the closure of the accounts.

The Deposit Agreement's jury waiver section includes a survival clause, which states:

> This agreement to arbitrate disputes and waiver of jury trial shall survive your death, the closing of your account and the termination of any of your business or transaction(s) with us, any bankruptcy to the extent consistent with applicable bankruptcy law and shall also survive as to any Claim covered within the scope of this [Deposit] Agreement.

Doc. 56-3 at 6–7. Similarly, the Deposit Agreement also contains a section entitled "Construction of Agreement," which provides:

> 46. Construction of Agreement . . . No termination of any account will affect your liability or obligations under this [Deposit] Agreement accruing prior to the date of termination or any provisions of this [Deposit] Agreement which, by their terms or nature, are intended to survive account termination.

*Id.* at 27. When read together, these sections clearly demonstrate that the jury waiver clause survives the closure of Kaplan's accounts with Regions. The survival clause of the jury waiver section explicitly states that the waiver survives the closing of Kaplan's account and the termination of any of Kaplan's business or transactions with Regions. Kaplan avers that it is undisputed that the accounts and the deposit relationship were terminated in 2012. Doc. 107 at 9. The "Construction of Agreement" provision states that a termination of any account will not affect

20

any provisions of the Deposit Agreement that, by their terms or nature, are intended to survive account termination. By virtue of its survival clause, the jury waiver qualifies as a provision of the Deposit Agreement that is intended to survive account termination. Thus, the plain language of these clauses is "fatal to Kaplan's argument." Doc. 104 at 12.

After beginning by asserting that Magistrate Tuite erred in concluding that the jury waiver survived the termination of the *Deposit Agreement*, Kaplan combats the plain language cited above, arguing that "a fair reading" of the "Construction of Agreement" provision contradicts Magistrate Judge Tuite's conclusion. Doc. 107 at 8–10. Kaplan points to the first clause of the "Construction of Agreement" section, which states, "No termination of any account will affect your liability or obligations under this [Deposit] Agreement accruing prior to the date of termination . . . ." *Id.* at 9 (quoting Doc. 56-3 at 27). Based solely on this language, Kaplan argues, Magistrate Judge Tuite's analysis overlooks that the malicious prosecution claim arose after Kaplan's termination of the accounts. Doc. 107 at 9–10. Significantly, Kaplan does not address the section's remaining language, which states that a termination of any account will not affect any provisions of the Deposit Agreement that are intended by their terms or nature to survive account termination. The Court agrees with Regions that "accruing prior to the date of termination" modifies "your liability or obligations under this [Deposit] Agreement." Doc. 110 at 14. Because Kaplan's analysis avoids the remaining language of the section, he necessarily omits mentioning the jury waiver's survival clause. As stated above, these two sections demonstrate that the jury waiver survives account termination.

Kaplan next argues that Magistrate Judge Tuite's conclusion and Regions' arguments "create a logical problem" because the jury waiver would be limitless and would apply "regardless of when a claim or controversy arises." Kaplan further contends that "while the jury clause

survives, it does not survive to encompass any conceivable claim arising years in the future." Doc. 107 at 9. Kaplan maintains, yet again, that the "appropriate" focus is on whether the malicious prosecution claim "arose directly from the Deposit Agreement and the banking relationship while the Deposit Agreement was in effect." *Id.* This attempt to avoid the plain language of the Deposit Agreement is unsuccessful. Contrary to the parade of horribles that Kaplan portrays, the jury waiver clause applies only to those claims that fall within one of the clause's enumerated categories. Furthermore, the Court previously rejected Kaplan's effort to shift the focus away from the plain language of the Deposit Agreement to the "banking relationship" between the parties in its discussion of the Deposit Agreement's plain language. Kaplan does not cite, nor has the Court found, any case law addressing jury waiver interpretation to support his proposition that the jury waiver clause survives as to only certain types of claims. Kaplan instead relies on cases addressing forum-selection or arbitration clauses. Docs. 107 at 11–12. The facts of these cases are distinguishable from the instant action, however, and ultimately the cases are unpersuasive.

Therefore, for the reasons discussed above, Magistrate Judge Tuite correctly held that the jury waiver survives the closure of the accounts.

### C. Magistrate Judge Tuite Did Not Clearly Err in Recommending the Court Take Judicial Notice of Only the Deposit Agreement

Regions also filed its Amended Request to Take Judicial Notice, in which Regions requests the Court to take judicial notice of numerous filings from *Kaplan I*, including trial transcripts, pleadings, and orders. Doc. 57 at 1–2. Magistrate Judge Tuite recommended granting this request in-part and only to the extent of taking judicial notice of the Deposit Agreement, as Kaplan does not dispute the validity of the jury waiver and the existence and accuracy of the Deposit Agreement is not reasonably in dispute. Kaplan did not object to Magistrate Judge Tuite's recommendation.

"Judicial notice is a means by which adjudicative facts not seriously open to dispute are established as true without the normal requirement of proof by evidence." *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, 369 F.3d 1197, 1204 (11th Cir. 2004). Judicial notice is appropriate at any stage of the proceeding. Fed. R. Evid. 201(d). Under Rule 201(b), judicial notice of an adjudicative fact is appropriate when such fact (1) is generally known within the court's territorial jurisdiction; or (2) is capable of being accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). An adjudicative fact is a fact that is "relevant to a determination of the claims presented in a case." *Dippin' Dots, Inc.*, 369 F.3d at 1204. A court must take judicial notice if a party requests the court to take judicial notice and the court is supplied with the requisite information. Fed R. Evid. 201(c)(2). The Eleventh Circuit has cautioned that "the taking of judicial notice of facts is, as a matter of evidence law, a highly limited process" because "judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in [the] district court." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).

Courts may take judicial notice of record documents from other proceedings. *Griffin v. Verizon Comm'cns Inc.*, 746 F. App'x 873, 876 (11th Cir. 2018) (per curiam). Documents from the public docket of a federal judicial proceeding are not subject to reasonable dispute. *Id. See also Makro Cap. Of Am., Inc. v. UBS AG*, 436 F. Supp. 2d 1342, 1350 (S.D. Fla. 2006) ("Documents filed with this or other courts certainly constitute 'public records.'") Furthermore, "a court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings. A court may thus take judicial notice of another court's order only for the limited purpose of recognizing the judicial act that the order represents or the subject matter of the litigation." *United States v.*

*Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994). However, because judicial notice pertains to only adjudicative facts, a court may decline to take judicial notice of facts which are irrelevant to the proceeding. *See*, *e.g.*, *United States v. Falcon*, 957 F. Supp. 1572, 1585 (S.D. Fla. 1997), *aff'd*, 168 F.3d 505 (11th Cir. 1999) ("A court may refuse to take judicial notice of facts that are irrelevant to the proceeding."); *NAFL Invs., Ltd. v. Van Ness Feldman LLP*, No. 2:18-cv-183-FtM-99MRM, 2018 WL 2717440, at *4 (M.D. Fla. June 6, 2018) (denying the defendant's request for the Court to take judicial notice of separate litigation because the documents and materials from that litigation were "immaterial to the Court's determination" of the instant motion); *Couch v. Broward Cnty.*, No. 11-62126-CIV, 2012 WL 2007148, at *1 (S.D. Fla. June 5, 2012) (denying the plaintiff's motions for judicial notice because, among other reasons, the facts were irrelevant). *See also Blass v. Flagstar Bancorp, Inc.*, 841 F. Supp. 2d 1280, 1285 (S.D. Fla. 2012) (denying the defendants' motion for judicial notice because such notice proved unnecessary for full resolution of the accompanying motion).

As Kaplan did not object to Magistrate Judge Tuite's recommendation that the Amended Request to Take Judicial Notice, the Court reviews Magistrate Judge Tuite's recommendation for clear error. *See Gropp*, 817 F. Supp. at 1562. Regions filed the Amended Request to Take Judicial Notice concurrently with the Motion and an "Amended Notice of Filing," which lists twenty-seven exhibits, totaling five-hundred five pages. *See generally* Docs. 55, 56, 57. The Amended Request to Take Judicial Notice requests the Court to take judicial notice of thirteen of these documents, all of which were filed in *Kaplan I*, in connection with the Court's review of the Motion. Doc. 57 at 1–2, 4 ("The Court should take judicial notice of the above-specified documents on Regions' amended motion to strike Kaplan's jury demand."). As previously mentioned, Regions devoted much of the Motion to arguing that the doctrine of collateral estoppel precludes Kaplan from

relitigating facts and issues decided in *Kaplan I*. Doc. 55 at 6–15. As a result, the Motion cited to filings from *Kaplan I* in an attempt to provide background information of that action. However, Kaplan did not challenge the determination in *Kaplan I* that he was bound by the jury waiver, Doc. 104 at 12 n.6, which narrowed the focus of the argument to whether Kaplan's malicious prosecution claim fell within the scope of the jury waiver and his subsequent argument that the jury waiver did not survive, *see* Docs. 55 at 15–18; 58 at 2–4; 62 at 1–5. Although Regions relied on Kaplan's Amended Counterclaim and Crossclaims and the order striking the jury demand to argue in his papers that the malicious prosecution claim fell within the scope of the jury waiver, *id.* at 15–16; Doc. 62 at 3, Magistrate Judge Tuite ultimately found only the Deposit Agreement relevant to deciding the Motion, as Kaplan had not challenged the validity of the jury waiver, Doc. 104 at 13.

This recommendation does not constitute clear error, as the Court is not left "with the definite and firm conviction that a mistake has been committed." *Coggin v. C.I.R.*, 71 F.3d 855, 860 (11th Cir. 1996). As demonstrated above, courts may refuse to take judicial notice if the documents are irrelevant to the proceeding or if the documents are immaterial or unnecessary to the resolution of the accompanying motion. For example, in *NAFL Investments*, the plaintiff-client filed a lawsuit against the defendant-law firm arising out of the plaintiff's use of the defendant's services in connection with a real property transaction with the Government, in which the Government paid for the plaintiff's land in Florida by trading land in Arizona, which was accompanied by certain financing. 2018 WL 2717440, at *1. Prior to the plaintiff commencing its lawsuit against the defendant, the Government had filed an action against the plaintiff in Arizona, in which the plaintiff had also retained the defendant. *Id.* at *2. The Arizona court subsequently ruled in favor of the Government. *Id.* In moving to dismiss the plaintiff's complaint, the defendant

moved the court to take judicial notice "of the entirety of the Arizona litigation, including factual findings and deposition testimony." *Id.* at \*3. The court denied the defendant's request, reasoning that the requested documents and evidence were "immaterial to the Court's determination" of the Motion. *Id.* at \*4. Here, with the exception of the Deposit Agreement, Magistrate Judge Tuite found all the requested filings from *Kaplan I* to be immaterial to his ultimate determination on the issues. Magistrate Judge Tuite found the Deposit Agreement to be relevant to the determination of the malicious prosecution claim, however. As he highlighted, the existence and accuracy of the Deposit Agreement is not reasonably in dispute and, in fact, is not disputed. Magistrate Judge Tuite did not take judicial notice of the Deposit Agreement for the truth of the matter asserted in the other litigation, either. Thus, upon review, absent from the Court's evaluation of this recommendation is "a definite and firm conviction that a mistake has been committed." *Coggin*, 741 F.3d at 860.

Therefore, the Court will adopt Magistrate Judge Tuite's recommendation to grant-in-part the Amended Request to Take Judicial Notice, insofar as it relates only to the Deposit Agreement.

## IV. Conclusion

Accordingly, it is now **ORDERED**:

1. The Report and Recommendation of Magistrate Judge Tuite, Doc. 104, is **ADOPTED**, **CONFIRMED**, and **APPROVED** in all respects and is made a part of this Order for all purposes, including appellate review.

2. Plaintiff Marvin I. Kaplan's objections to the Report and Recommendation, as set forth in the Exceptions/Objections to the Magistrate's Order Striking Plaintiff's Jury Demand, Doc. 107, are **OVERRULED**.

3. Defendant Regions Bank's Amended Motion to Strike Kaplan's Jury Demand and Supporting Memorandum of Law, Doc. 55, is **GRANTED**. Plaintiff Marvin I. Kaplan's Demand for Jury Trial, Doc. 32, is **STRICKEN**.

4. Defendant Regions Bank's Amended Request to Take Judicial Notice on Amended Motion to Strike Jury Demand, Doc. 57, is **GRANTED-IN-PART** and **DENIED-IN-PART**, insofar as the Court takes judicial notice of the Deposit Agreement only.

**DONE AND ORDERED** in Tampa, Florida on September 25, 2019.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any