**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MARVIN I. KAPLAN,

     Plaintiff,

v.                               Case No: 8:17-cv-2701-CEH-CPT

REGIONS BANK,

     Defendant.

_____

## <u>ORDER</u>

This cause comes before the Court upon Defendant's Motion for Summary Judgment (Doc. 180), Plaintiff's Motion for Partial Summary Judgment (Doc. 183), and the associated responses and reply (Docs. 188, 189, 196). Both motions are ripe for the Court's review. Upon careful consideration, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Partial Summary Judgment.

## I.    BACKGROUND AND FACTS

### A. The Underlying Lawsuit and the "Investment Deals"

This malicious prosecution action stems from a case in the Middle District of Florida styled *Regions Bank v. Kaplan, et al.*, No. 8:12-cv-01837-EAK-MAP (M.D. Fla.) ("*Kaplan I*"), in which Regions sued Kaplan and several of his companies for, *inter alia*, fraudulent concealment, civil conspiracy, conversion, and aiding and

abetting.[1] Doc. 113 ¶¶ 1, 48, 57. Regions initially brought its claims against several of Kaplan's companies and claimed that his fraudulent transactions led to significant account overdrafts. *Id.* ¶ 48. Regions later amended its complaint to include several other Kaplan-controlled companies as defendants and increased the damages sought. Doc. 181-5 at 7. After further investigation, litigation, and discovery, Regions filed a Second Amended Complaint and added claims against Kaplan individually (the "Tort Claims"). Doc. 181-17; Doc. 192-1. Kaplan now sues Regions for malicious prosecution based on those claims, asserting that they were wrongly brought against him. Doc. 113.

The underlying case involved numerous individuals, entities, banks, investment deals, and allegations of "check-kiting."[2] Kaplan controlled four entities with Regions accounts: R1A Palms, LLC; Triple Net Exchange, LLC; MK Investing, LLC; and BNK Smith, LLC. Doc. 181-4; Doc. 181-1 ¶ 7. Around 2008, he began to invest with a company called Smith Advertising and Associates, Inc. ("SAA"), operated by Gary and Todd Smith. Doc. 181-1 ¶¶ 15–22. The "investment deals" operated as follows: Kaplan would make a short-term loan to SAA, so that

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including the Joint Statement of Undisputed Facts (Doc. 187), declarations, depositions, filings and orders in *Kaplan I*, and other evidence in the record.

[2] Check-kiting is "[t]he illegal practice of writing a check against a bank account with insufficient funds to cover the check, in the hope that the funds from a previously deposited check will reach the account before the bank debits the amount of the outstanding check." CHECK-KITING, Black's Law Dictionary (11th ed. 2019). In other words, "check kiting, at root, is a plan designed to separate the bank from its money by tricking it into inflating bank balances and honoring checks drawn against accounts with insufficient funds. In essence, a check kite allows the schemers to trick the banks into giving them interest-free loans." *United States v. Yoon*, 128 F.3d 515, 522 (7th Cir. 1997).

SAA could take advantage of purported time-sensitive vendor discounts. *Id.* ¶ 21. SAA would then swiftly repay the loan, splitting the discount amount with Kaplan as interest. *Id.* ¶ 23. Between 2008 and 2011, Kaplan and SAA successfully completed hundreds of similar transactions. *Id.* ¶ 24.

These investment opportunities were completely fraudulent, as there were no vendors or vendor discounts, and SAA was nothing more than a Ponzi scheme designed to earn money for the company, its principals, and others associated with the scam. *Id.* ¶ 75. The fraud was eventually uncovered, and numerous individuals were criminally prosecuted, including SAA's principals. *Id.* at 3–4. Kaplan was not prosecuted, however, and the *Kaplan I* Court found, after a bench trial, that he had no actual knowledge that SAA was a fraudulent company or that the investment deals were part of a check-kiting scheme. *Id.* ¶¶ 97, 111, 114, 120, 122.

## B. The Bundled Deals and the Scheme's Collapse

The Tort Claims focused on a series of deals from just a single week. Doc. 181-1 ¶¶ 44–75. SAA primarily used its Bridgeview Bank Group ("BBG") account for the relevant deals. *Id.* ¶ 16. Between January 19, 2012, and January 24, 2012, Kaplan agreed to four "bundled deals" with SAA. *Id.* ¶ 44. SAA told him that, although the deals were larger than previous ones, it hoped to take advantage of the same vendor discounts and needed short-term bridge loans to do so. Doc. 181-7 ¶ 72. SAA asked Kaplan to wire funds from his various Regions bank accounts to its BBG

account, at which point SAA would ship repayment checks to Kaplan the same day. *Id.* ¶¶ 73–74.

The deals initially went as planned. As part of the First Deal, SAA shipped checks and promissory notes to Kaplan on January 19, to arrive on January 20. Doc. 181-1 ¶ 45. On the morning of January 20, Kaplan initiated transfers of $400,000 and $1,600,000 from his BNK and TNE Regions accounts to his R1A Regions account. *Id.* Later that morning, he wired $9,700,000 to SAA's BBG account. *Id.* Kaplan received the First Deal checks and deposited a total of $10,061,375 into his various Regions accounts that day. *Id.*

The other deals were similarly structured, but the scheme began to unravel. *Id.* ¶¶ 46–75. On January 24, Smith and Kaplan agreed to a Fourth Deal, pursuant to which Kaplan wired $2,000,000 to SAA. *Id.* ¶ 51. That morning, however, Kaplan learned that Regions had not credited the Second Deal Checks to him. *Id.* ¶ 53. He contacted Regions about these deposits, and a representative informed him that a hold had been placed on the Second Deal Checks. *Id.* ¶¶ 53–54. Kaplan called Todd Smith and informed him that the Third Deal could not proceed due to the bank hold. *Id.* ¶ 55. In hopes of completing the transaction, Smith sent Regions a falsified screenshot showing a positive balance in SAA's account, when in fact the account had a negative balance. *Id.* ¶ 56. Regions informed Kaplan that the screenshot would not be sufficient to release the hold on the Second Deal Checks. *Id.* ¶ 57. The same day, Kaplan received the Third Deal checks. *Id.* ¶ 58. Smith called Kaplan and

suggested that he put a stop payment on the Second Deal checks in place of a wire transfer and deposit the Third Deal checks. *Id.* ¶ 59. Smith later changed his mind and told Kaplan not to deposit the Third Deal checks due to issues with SAA's account. *Id.* ¶ 60.

On January 25, Regions advised Kaplan that the First Deal Checks had been returned unpaid. *Id.* ¶ 65. When Kaplan contacted SAA, he was told that BBG had frozen all of SAA's accounts. *Id.* ¶ 66. SAA then sent Kaplan $10,550,000 worth of checks by air courier drawn on a Wells Fargo Bank ("WFB") account, which Kaplan deposited. *Id.* ¶ 66. On the same day, Kaplan met with three Regions officers, who asked him why SAA sent him checks instead of wire transfers. Doc. 181-55 at 21:17–22:19; 24:11–22. Kaplan replied that it was because "we leverage the float." *Id.* According to a Regions employee, Kaplan also stated that "Smith Advertising was adamant [on] taking advantage of the float." *Id.* at 55:17–25.

On January 26 and 27, Regions provided Kaplan with written notice of dishonor of the First and Second Deal checks. Doc. 181-1 ¶¶ 70–71. A few days later, Regions notified Kaplan that the replacement checks had been dishonored. *Id.* ¶ 72. When the dust finally settled, nearly $33 million of checks had been returned, resulting in over $9 million of overdrafts in Regions accounts. Doc. 180 at 2.

### C. Regions' Initial Complaint and Subsequent Investigation

Litigation began almost immediately. On January 30, 2012, Regions sued several Kaplan-controlled entities to recoup lost funds. Doc. 181-3. Wells Fargo

Bank was also named in the suit, as Regions sought the imposition of a constructive trust upon funds held in a Kaplan-controlled WFB account. *Id.* In February, Kaplan agreed to return the funds, which he had diverted to his WFB account the week the scheme collapsed. Doc. 181-4. In August 2012, Regions then amended its complaint to include several other Kaplan entities and clarified the amount of overdrafts. Doc. 181-5 at 7; Doc. 181-12 at 4–5. At this point, the Tort Claims against Kaplan still had not been filed. *Id.*

As the lawsuit proceeded, Regions collected evidence about the scheme through discovery, responsive pleadings, and counterclaims/crossclaims filed by the Defendants. For example, in March 2012, Regions subpoenaed SAA's account records from BBG. Doc. 181-6 ¶ 6. And in Kaplan's crossclaim against BBG, he described the flow of funds between the Kaplan entities and SAA. Doc. 181-7 ¶¶ 65–106. He accused BBG of being a "direct and knowing participant[] in the scheme with knowledge of the activities and directly participating in the fraud by actively transferring money between accounts, floating checks to facilitate the fraud and by inducing investors to wire funds by manipulating and false statements." *Id.* ¶ 40. Kaplan also stated in response to an interrogatory that the transactions "clearly would have appeared to any experienced bank to be a check kiting operation." Doc. 181-9 at 2.

Regions continued its investigation, as its SVP and Assistant General Counsel Shayla Fletcher described in deposition testimony. *See* Doc. 181-11. Fletcher noted that, before filing the Tort Claims against Kaplan, she reviewed case law and factual

findings with outside counsel and Regions' employees. *Id.* at 72:22–73:10; 79:23–81:1, 84:1–12; 86:3–6. Fletcher stated that Kaplan's pleadings and discovery documents were also reviewed. *Id.* at 76:21–77:16. David S. Garbett, lead outside counsel to Regions in *Kaplan I*, was also involved in the investigation. Doc. 192-1. He conducted a review of SAA's account records, Kaplan's bank statements and wire transfer records, Kaplan's pleadings, relevant case law, and other evidence. *Id.* at 1–4. Regions also later deposed Kaplan for several days, and Garbett regularly discussed the progress of the case with Regions' in-house counsel. *Id.* at 5–7.

### D. Regions Adds the Tort Claims Against Kaplan and the Case Proceeds to Trial

In November 2013, nearly two years after filing its initial complaint, Regions filed a Second Amended Complaint which included claims against Kaplan individually for fraudulent concealment, civil conspiracy, conversion, and aiding and abetting. Doc. 181-17. The Second Amended Complaint alleged that Kaplan, his companies, and SAA engaged in a "massive kiting scheme" using Kaplan's accounts at Regions and SAA's account at BBG. *Id.* ¶¶ 10–11. In the lead-up to trial, expert witnesses retained by Kaplan and Regions agreed that the transactions were consistent with a check-kiting scheme. Docs. 181-12, 181-13. Kaplan's expert opined that the primary purpose of SAA's account was to write bad checks, found evidence of kiting, and admitted at a deposition that leveraging the float supported knowledge of kiting. Doc. 181-13 at 2–10; Doc. 181-14 at 251:11–258:8.

Additionally, several dispositive motions were decided. First, Kaplan's motion to dismiss was denied. Doc. 181-19. His motion for summary judgment was also denied, except as to the conversion and aiding and abetting conversion counts, which were dismissed. Doc. 181-28. A bench trial was held before United States District Judge Elizabeth A. Kovachevich on the remaining claims, and after a month of trial, Judge Kovachevich ruled in favor of Kaplan on all counts. *See* Doc. 181-1. Kaplan prevailed at trial because the Court found that he: (1) had no actual knowledge of SAA's Ponzi scheme, or that the deals were illegitimate; (2) did not know SAA's account balance; (3) had completed many similar transactions without issue; and (4) was not the only individual with deposits in SAA's account. Doc. 181-1 at ¶¶ 97–102.

### E.  Present Action and Procedural History

Kaplan filed the present action in November 2017, accusing Regions of malicious prosecution and abuse of process. Doc. 1 ¶¶ 67–87. The Court dismissed the abuse of process claim in August 2018. Doc. 37 at 10. The case was then stayed pending Regions' appeal of *Kaplan I*. Doc. 77. It was reopened in November 2021 after the Eleventh Circuit affirmed the trial court's findings in *Kaplan I*. Doc. 169-1. Kaplan now brings a single count of malicious prosecution against Regions, claiming that the Tort Claims were brought without probable cause and with malice, and seeking compensation for reputational damage, emotional pain, and mental anguish, in addition to legal costs. Doc. 113 ¶¶ 69–76.

## II.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, along with any affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden is discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying on conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 Fed. App'x. 852, 858 (11th Cir. 2006). Summary judgment should

be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the undisputed facts. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Eleventh Circuit has explained that cross-motions for summary judgment will not, in themselves, warrant a grant of summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed. *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## III.   ANALYSIS

### A. Defendant's Motion for Summary Judgment

Regions seeks summary judgment, arguing that it had probable cause to bring the Tort Claims. Doc. 180. Kaplan responds that Regions' motion must be denied based on the findings in *Kaplan I*, and that he is entitled to summary judgment on

each of the six elements of malicious prosecution, except for damages, which are in dispute and should go to trial. Doc. 188 at 1–2; Doc. 183 at 3. Regions replies that, because Kaplan fails to establish a triable issue regarding the absence of probable cause, his claim must be dismissed. Doc. 196 at 1–2.

At the outset, the Court notes that Kaplan does not specifically challenge Regions' factual allegations in his pleadings. Doc. 188. Instead, he claims that the material facts of the underlying action were decided by the *Kaplan I* Court, and that Regions is wrongly attempting to relitigate those claims. *Id.* at 3. Kaplan also argues that the Ponzi scheme and check-kiting allegations are one and the same, that Regions had no evidence of his actual knowledge of the fraud, and that Regions' investigation was fatally deficient. *Id.* at 4–15. Further, he maintains that Regions improperly ignored an exculpatory FBI report—a contention that the Court addresses *infra*. These arguments are unpersuasive.[3] In fact, based on the legal standard for malicious prosecution, Regions' investigation and its evidence for the Tort Claims are integral to the question of probable cause, because the analysis is based on whether Regions had "a reasonable belief, based on the facts and circumstances known to [it], in the validity of the claim[s]." *DeMartini v Town of Gulf Stream,* 942 F.3d 1277, 1309 (11th Cir. 2019).

Under Florida law, a claim for malicious prosecution requires a plaintiff to establish each of the following six elements: that (1) an original criminal or civil

---

[3] Kaplan makes virtually identical arguments in his motion for partial summary judgment. Doc. 183.

judicial proceeding against the plaintiff was commenced or continued; (2) the defendant was the legal cause of the proceeding against the plaintiff; (3) the termination of the proceeding constituted a *bona fide* termination in favor of the plaintiff; (4) there was an absence of probable cause for the proceeding; (5) there was malice on the part of the defendant, and (6) the plaintiff suffered damage as a result of the proceeding. *Alamo Rent-A-Car v. Mancusi*, 632 So.2d 1352, 1354 (Fla 1994); *see also DeMartini,* 942 F.3d at 1309 (listing elements). "The failure of a plaintiff to establish any one of these six elements is fatal to a claim of malicious prosecution." *Alamo*, 632 So.2d at 1354.

The first three elements are uncontested here, and because the Court concludes that Kaplan cannot establish a genuine issue of material fact as to probable cause, the Court limits its inquiry to this issue. To show that it had probable cause, Regions need only establish that it had "a reasonable belief, based on the facts and circumstances known to [it], in the validity of the claim[s]." *DeMartini*, 942 F.3d at 1301 (quoting *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1211, 1218 (11th Cir. 2010). "The standard for establishing probable cause in a civil action is extremely low and easily satisfied." *Gill v. Kostroff,* 82 F. Supp. 2d 1354, 1364 (M.D. Fla. 2000). Whether probable cause exists is generally determined based on the facts known by the defendant at the time the underlying action was initiated, not some later point in time. *See United States v. Irurzun,* 631 F.2d 60, 62 (5th Cir. 1980). And denial of summary judgment in the underlying litigation, "while not conclusively proving

probable cause, is a strong indication of a substantial case." *Wright v. Yurko,* 446 So.2d 1162, 1167 (Fla. 5th DCA 1984).

Throughout its filings, Regions supports the decision to bring the Tort Claims by citing to numerous sources of evidence. These include: (1) account records of the involved parties; (2) Kaplan's deposition testimony; (3) Kaplan's admission to Regions that he and SAA were leveraging the float; (4) Kaplan's descriptions of the deals in his counterclaims and crossclaims; and (5) the comprehensive legal and factual investigation Regions conducted.

### i. Regions Had Probable Cause to Bring Claims for Fraudulent Concealment and Aiding and Abetting Fraudulent Concealment Against Kaplan

The Court begins by analyzing each of the counts that survived summary judgment in *Kaplan I*: Fraudulent Concealment, Aiding and Abetting Fraudulent Concealment, and Civil Conspiracy. Doc. 181-28 at 20–35. These claims will be addressed first, because a denial of summary judgment, while not dispositive as to the issue of probable cause, is "a strong indication of a substantial case." *Wright,* 446 So.2d at 1166.

A claim for fraudulent concealment requires a plaintiff to establish that the defendant (a) breached a duty to disclose a material fact; (b) knew or should have known that disclosure would induce plaintiff's actions; and (c) that the plaintiff detrimentally relied on the misinformation. *Hess v. Philip Morris USA, Inc.*, 175 So.3d 687, 691 (Fla. 2015).

Regions asserts that its fraudulent concealment claim was supported by probable cause and that no reasonable jury could find otherwise. Doc. 180 at 30. Regions also argues that Kaplan knew of the ongoing check-kiting. *Id.* In support of this point, Regions contends that Kaplan knew SAA lacked sufficient funds to prepay vendors, but was still somehow able to issue repayment checks to him on the same day the loan money was sent. *Id.* It also argues that Kaplan admitted to leveraging the float, and never actually obtained verification from SAA that its account had sufficient funds before depositing the NSF checks. *Id.* Regions also cites Florida caselaw that supported their belief that Kaplan owed Regions a duty to disclose based on his advanced knowledge of banking and use of artifice or trick. *Id.* at 30 n.8. Finally, Regions notes that check-kiting can constitute a special circumstance imposing a duty of disclosure under Florida law. *See Barnett Bank v. Hooper*, 498 So.2d 923 (Fla. 1986).

The *Kaplan I* Court denied Kaplan's motion for summary judgment as to the fraudulent concealment count. Doc. 181-28 at 33–34. It noted that summary judgment was denied to Kaplan's companies on the same claim, and that Kaplan acted as their authorized agent in carrying out the relevant transactions. *Id.* at 34. The *Kaplan I* Court found that an "[i]ntent to defraud can be based on circumstantial evidence," and that Kaplan testified in deposition that "when the accounts were opened, [he] advised Regions that there would be many check deposits and many wire transfers, but did not provide any facts as to the 'deals' [he] entered into with SAA/Smiths." *Id.* at 30.

14

Based on the undisputed factual record, no reasonable jury could find that Regions lacked probable cause to bring the fraudulent concealment claim. Regions conducted an extensive investigation following the discovery of the overdrafts, through which it discovered the check-kiting. Doc. 192-1. Furthermore, as corroborated by Regions' expert witnesses, SAA's bank account records clearly indicated that the deals were part of a check-kiting scheme. Doc. 181-12. The fact that the trial court ruled in Kaplan's favor based on his lack of actual knowledge of the fraud does not establish an absence of probable cause to bring the claim, as Kaplan attempts to argue. Doc. 183 at 15; Doc. 188 at 1–2. To the contrary, based on the evidentiary record, Regions clearly meets the low standard needed to show that it had a reasonable belief in the validity of the claim. Thus, no reasonable jury could find that Regions lacked probable cause to bring a claim for fraudulent concealment.

Regions relies on largely the same facts to argue that it had probable cause to bring an aiding and abetting fraudulent concealment claim. Doc. 180 at 8–9, 31. A claim of aiding and abetting fraud requires proof of three elements: "(1) the existence of an underlying fraud; (2) that the defendant had knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the commission of the fraud." *Sun Life Assurance Co. of Canada v. Imperial Premium Fin.,* LLC, 904 F.3d 1197, 1214 (11th Cir. 2018).

The *Kaplan I* Court denied summary judgment on this count as well. Doc. 181-28 at 34; Doc. 181-29. And as already mentioned, Regions conducted an extensive investigation into the check-kiting scheme, supported by outside counsel as

well as Regions' personnel. Through this investigation, it acquired sufficient facts to form a reasonable belief that: (1) there was an underlying fraud—the check-kiting scheme; (2) Kaplan had knowledge of it, as supported by his statements about "leveraging the float," his substantial profits, and his control of the Kaplan entities; and (3) that he provided substantial assistance to advance the commission of the fraud by orchestrating the account transfers. *See* Doc. 192-1. These facts mirror the elements of the offense. Considering the evidentiary record, there is no genuine dispute that Regions had probable cause to bring this claim.

### ii. Regions Had Probable Cause to Bring a Civil Conspiracy Claim Against Kaplan.

Regions' third claim was for civil conspiracy. Doc. 113 ¶ 57. A civil conspiracy claim requires a plaintiff to show that (1) a defendant entered into an agreement (2) to perform an unlawful act or lawful act by unlawful means and (3) committed an overt act in pursuance of the conspiracy (4) causing damages to plaintiff. *Charles v. Fla. Foreclosure Placement Ctr., LLC,* 988 So.2d 1157, 1160 (Fla. Dist. Ct. App. 2008). Regions argues that its evidence supported a claim of civil conspiracy on the grounds that Kaplan worked in unison with SAA to facilitate the check-kiting scheme, including when SAA used an edited screenshot to try and induce Regions to provide availability on the Second Deal checks. Doc. 181-30 at 32. Regions also notes that Kaplan and SAA communicated in the aftermath of the kite collapse and that Kaplan deposited more than $10 million in replacement checks that turned out to be worthless. *Id.*

In its order denying summary judgment on this count, the *Kaplan I* Court found that a civil conspiracy may be established by circumstantial evidence. Doc. 181-29 at 3–4. It also noted that there was no dispute that Kaplan formed the entities involved, agreed to each of the deals, deposited checks to the accounts of each entity, and personally initiated the outgoing wire transfers. *Id.* at 4. Based on this, as well as the fact that Kaplan and his companies participated in these "investments" to profit on the short-term loans, the Court found that a reasonable jury could find in favor of Regions.

On the undisputed evidentiary record presented here, including the *Kaplan I* Court's order denying summary judgment, as well as the previously discussed evidence of Regions' investigation and factual support for the claims (Docs. 181-11, 192-1), Kaplan has failed to establish a genuine issue of material fact as to the probable cause element for this claim. Thus, Regions is entitled to summary judgment.

### iii.   Regions Had Probable Cause to Bring Conversion and Aiding and Abetting Conversion Claims Against Kaplan.

Under Florida law, the elements of conversion are "(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein." *Special Purpose v. Prime One*, 125 F. Supp. 2d 1093, 1099–1100 (S.D. Fla. 2000) (citing *Warshall v. Price,* 629 So.2d 903, 904 (Fla. 1993)). The elements necessary to sustain an aiding and abetting claim are: "(1) an underlying violation on the part of the primary wrongdoer; (2) knowledge of the underlying

violation by the alleged aider and abetter; and (3) the rendering of substantial assistance in committing the wrongdoing by the alleged aider and abettor." *Lawrence v. Bank of Am., N.A.,* 455 Fed.Appx. 904, 906 (11th Cir. 2012) (citations omitted).

Regions argues that it reasonably believed the check-kiting scheme, which Kaplan and his entities facilitated, was an act of dominion wrongfully asserted over Regions' funds, inconsistent with Kaplan's right to them. Doc. 180 at 33–34. Regions also relies on caselaw holding that knowingly presenting worthless checks can qualify as conversion, and that provisionally-credited funds on checks constitute bank property. *Id.* Additionally, Regions argues that it believed the funds were specifically identifiable at the time of filing. *Id.*

On the conversion and aiding and abetting conversion counts, the *Kaplan I* Court granted summary judgment for Kaplan. Doc. 181-28 at 25–27, 34. However, nothing in the *Kaplan I* Court's order suggests that Regions lacked probable cause. Instead, Kaplan prevailed on strictly technical grounds. *Id.* at 27. First, the *Kaplan I* Court found that the accounts at issue were "demand deposit accounts, not special accounts." *Id.* Further, the order provides that: "[a]lthough the alleged conversion claim relates to specific checks, there is no specific and identifiable money associated with the claim. As Defendants' authorized agent, Defendant Kaplan was authorized to place the payment orders for Defendants. There was no unauthorized act which deprived Regions of the funds." *Id.* at 27.

On the record before this Court, Regions had a "reasonable belief, based on the facts and circumstances known to [it]," that the conversion claims were valid.

18

*DeMartini*, 942 F.3d at 1301. Regions argues that it believed Kaplan's NSF checks qualified as specific and identifiable funds, and that the check-kiting scheme was a fraud that resulted in significant monetary loss to Regions. Doc. 180 at 33–34. Kaplan does not challenge this version of the facts or present any evidence showing that Regions lacked probable cause. Kaplan merely relies on the order of the *Kaplan I* Court. Consequently, although the conversion claims were defeated at summary judgment, the record shows that Regions had a reasonable belief that they were valid. Thus, the Court finds that Regions has met the "extremely low" standard for probable cause, and that no reasonable jury could find that Regions lacked probable cause to bring the claims. *Gill*, 82 F. Supp. 2d at 1364.

   iv.   **Kaplan's FBI Report Does Not Show that Regions Lacked Probable Cause**

Finally, the Court will address Kaplan's claims that an FBI affidavit filed in the criminal action against Todd Smith and Gary Smith (Doc. 184-6) proves that Regions lacked probable cause. Doc. 188 at 10–11; Doc. 183 at 9–15. Kaplan argues that, assuming Regions had probable cause to file the Tort Claims, it was lost as soon as Regions received this document. *Id.* at 10. In describing the affidavit, Kaplan is correct that it states he was unaware of the Ponzi scheme and even names him as a "victim of [the] offense." Doc. 184-6 at 6. However, it does not prove or even support a finding that Regions lacked probable cause.

The affidavit was filed in support of a criminal complaint against SAA's principals and focuses on their Ponzi scheme. *Id.* at 2–14. However, as Regions

points out, the Tort Claims were based on check-kiting, not the Ponzi scheme. *See* Doc. 181-17 ¶¶ 10–41. The *Kaplan I* Court also reiterated in its summary judgment order that the underlying wrong alleged in the case was check-kiting, not a Ponzi scheme. Doc. 181-29 at 4. Thus, Kaplan's arguments regarding the affidavit do not create a genuine issue of material fact as to whether Regions had probable cause to bring the Tort Claims, which were based on check-kiting.

## B.  Kaplan's Motion for Partial Summary Judgment

Kaplan seeks summary judgment as to all the elements of his malicious prosecution claim except for damages, which he argues should proceed to trial. Doc. 183 at 8–17. The Court has carefully reviewed the arguments made by Kaplan in his Motion for Partial Summary Judgment and associated filings, which are substantively identical to his responses to Regions' Motion. Because Regions had probable cause to assert the Tort Claims in *Kaplan I*, which were based on check-kiting, Kaplan cannot establish a claim for malicious prosecution. Thus, Kaplan is not entitled to partial summary judgment. As previously discussed in this order, the Court will grant summary judgment in favor of Regions as no genuine issue of material fact exists as to the presence of probable cause for its Tort Claims against Kaplan in *Kaplan I*. Thus, Kaplan's Motion for Partial Summary Judgment is due to be denied.[4]

---

[4] A *Daubert* motion is also pending in this matter. *See* Doc. 182. However, given the Court's threshold ruling on the probable cause element, the Court need not address the motion, which seeks to exclude Plaintiff's economic damages expert.

IV.     **CONCLUSION**

Accordingly, it is **ORDERED** as follows:

1. Regions Bank's Motion for Final Summary Judgment, (Doc. 180), is **GRANTED**.

2. Marvin I. Kaplan's Motion for Partial Summary Judgment and Incorporated Memorandum of Law, (Doc. 183), is **DENIED**.

3. The Clerk is directed to enter Judgment in favor of Defendant Regions Bank and against Plaintiff Marvin I. Kaplan. The Clerk is further directed to terminate any pending motions and deadlines and **CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida on March 23, 2023.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties